**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

MARTIN RODRIGUEZ,

                       Plaintiff,

            v.                               No. 3:14-CV-1552

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                       Defendant.

_____

**CHRISTIAN F. HUMMEL
U.S. MAGISTRATE JUDGE**

**APPEARANCES:**                        **OF COUNSEL:**

Lachman & Gorton                  PETER A. GORTON, ESQ.
Attorneys for Plaintiff
1500 E. Main Street
P.O. Box 89
Endicott, New York 13761-0089

Social Security Administration,       DAVID L. BROWN, ESQ.
Office of General Counsel            Special Assistant U.S. Attorney
Attorneys for Defendant
26 Federal Plaza - Room 3904
New York, New York 10278

### MEMORANDUM-DECISION AND ORDER

     Plaintiff Martin Rodriguez ("Rodriguez") brings this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying his application for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under the Social Security Act.  Rodriguez moves for a

finding of disability, and the Commissioner cross-moves for a judgment on the pleadings.

Dkt. Nos. 10, 11.

# I. Background

## A. Procedural History

Rodriguez, born on September 12, 1975, applied for DIB and SSI on June 8, 2011, alleging an onset date of November 20, 2010. T.[1] 221-29. The applications were denied on October 7, 2011. Id. at 134-39. Rodriguez requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 140-41. A hearing was scheduled for January 18, 2013, but was rescheduled at the request of Rodriguez's counsel. Id. at 36-48. A subsequent hearing was held on June 4, 2013. Id. at 49-109 (administrative hearing transcript). In a decision dated June 17, 2013, ALJ Edward I. Pitts held that Rodriguez was not entitled to disability benefits. Id. at 10-35. Rodriguez timely filed a request for review, and on November 28, 2014, the Appeals Council denied Rodriguez's request, making the ALJ's findings the final decision of the Commissioner. Id. at 1-9.

## B. Facts

Rodriguez alleged that he was disabled due to back injuries, knee and heel injuries, and asthma. T. 113. Rodriguez testified that he stopped attending school in eighth grade and never received a high school equivalency diploma. Id. at 53. He previously worked as a second pressman in Binghamton, New York, from 1998 through 1999, with the primary responsibility of keeping a press running. Id. at 54. He held a job as a pressman in Long

---

[1] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. See Dkt. No. 9.

-2-

Island, New York, in 2000.  Id. at 56.  Rodriguez then held a job in construction, bending

plastic pipes, in 2004.  Id.  He then worked for six months at a maintenance company,

vacuuming floors at construction sites, and in warehouses.  Id. at 57.  While working for the

maintenance company, he was injured when a bulldozer ran over his leg.  Id. at 57-58.  His

right heel was crushed, his right hand was broken, and he tore his ACL.  Id. at 58.  After this

injury in 2006, Rodriguez did not work again until 2008, when he worked at Dunkin Donuts,

where he worked the register and unloaded the delivery trucks.  Id.  He then worked at

McDonald's, where he worked the register and unloaded the delivery trucks.  Id.  at 59.


## II.  Discussion

### A.  Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision.  Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is

"'more than a mere scintilla,'" meaning that in the record one can find "'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"

Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402

U.S. 389, 401 (1971) (internal quotation marks omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with

sufficient specificity to allow a court to determine whether substantial evidence supports the

decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing

Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute

its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. <u>Yancey v. Apfel</u>, 145 F.3d 106, 111 (2d Cir. 1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 U.S.C. § 405(g); <u>see</u> <u>Halloran</u>, 362 F.3d at 31.

## B. Determination of Disability

"Every individual who is under a disability. . . shall be entitled to a disability. . . benefit . . . ." 42 U.S.C. § 423(a)(1). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." <u>Id.</u> § 423(d)(1)(A). A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. <u>Id.</u> § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." <u>Id.</u> § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." <u>Ventura v. Barnhart</u>, No. 04 Civ. 9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983)) (additional citation omitted).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

First, the [Commissioner] considers whether the claimant is

currently engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467. The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).

## C. ALJ Pitts' Findings

Rodriguez, represented by counsel, testified at the hearing held on June 4, 2013. T. 49-109. Using the five-step sequential evaluation, ALJ Pitts found that Rodriguez (1) had not engaged in substantial gainful activity since November 20, 2010, the alleged onset date; (2) had the following severe medically-determinable impairments: depression, degenerative joint disease of the right knee, history of right foot fracture, and history of right finger fracture; (3) did not have an impairment, alone or in combination, sufficient to meet the

listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintained

> the residual functional capacity to perform only unskilled work; he can have occasional contact with the general public, but frequent contact with co-workers and supervisors; he can generally perform at light exertion; but he has occasional postural limitations, and specifically needs to change positions from sitting to standing or vice versa about every 30 minutes, but can do so while remaining at the workstation on task; his overall standing and walking is limited to no more than four hours per day; and his sitting is unlimited.

and, thus; (5) given his age, education, work experience, and RFC, was capable of engaging in employment which exists in significant numbers in the national economy. Id. at 13-29.

### D. Rodriguez's Contentions

Rodriguez contends that the ALJ erred by (1) improperly substituting his own opinion for the opinions of the physicians of record, and in doing so, awarding the improper amount of weight to some sources, treating and non-treating; (2) failing to properly assess functional limitations caused by Rodriguez's asthma; (3) improperly assessing Rodriguez's credibility; (4) improperly relying on the testimony of a vocational expert that was based on a faulty hypothetical. Dkt. No. 10 at 13-26. Rodriguez further contends that the ALJ's RFC assessment is not supported by substantial evidence. Id. at 13-17.

### 1. RFC

The ALJ determined that plaintiff retained the RFC:

to perform only unskilled work; he can have occasional contact with the general public, but frequent contact with co-workers and supervisors; he can generally perform at light exertion; but he has occasional postural limitations, and specifically needs to change positions from sitting to standing or vice versa about every 30 minutes, but can do so while remaining at the workstation on task; his overall standing and walking is limited to no more than four hours per day; and his sitting is unlimited.

T. 20. In reaching this assessment, the ALJ discussed the opinions of Dr. David Richard Graham, M.D.; Dr. Justine Magurno, M.D.; Dr. Mila Bacalla, M.D., State Agency Medical Consultant; Dr. Sara Long, Ph.D.; Dr. Lawrence Weisner, D.O.; Dr. A. Hochberg, State Agency Review Psychologist; Dr.Nathan Hare, Ph.D.; Andrew G. Buckley, OTR/L CHT; and Valerie Jones-Giles, LCSW. Id. at 23-26.

RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms. Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R. §§ 404.1545, 416.945. "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." Martone, 70 F. Supp. 2d at 150 (citations omitted). RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960. The Second Circuit has clarified that, in step five of the Commissioner's analysis, once RFC has been determined, "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

## E. Rodriguez's Ability to Perform Light Work

The ALJ found that Rodriguez could perform unskilled work at the light exertion level, with occasional postural limitations, noting that "specifically [Rodriguez] needs to change positions from sitting to standing or vice versa about every 30 minutes, but can do while remaining at the workstation on task; his overall standing and walking is limited to no more than four hours per day; and his sitting is unlimited." T. 20. Rodriguez argues that the ALJ's RFC assessment is not supported by substantial evidence. Dkt. No. 10 at 13. Specifically, Rodriguez argues that (1) the ALJ erred in finding that Rodriguez could perform light work, because Dr. Magurno's opinion, to which the ALJ assigned significant weight, noted moderate to marked limitations for walking and standing, and marked limitations for squatting, lifting, carrying, pushing, and pulling on Rodriguez's right side; (2) the ALJ erred in assigning significant weight to Dr. Bacalla's opinion; and (3) the ALJ erred in assigning limited weight to Dr. Weisner's opinion. Id. at 13-17.

The regulations state that light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b). A claimant must be able to perform "substantially all" of the activities described in order to be found capable of performing light work. Id. Some skilled and semi-skilled jobs at the light exertion level allow for sitting most of the time, while operating hand and foot controls. Social Security Ruling ("S.S.R.") 83-10, Titles II and XVI: Determining Capability to do Other Work – the Medical-Vocational Rules of Appendix 2,

1983 WL 31251, at *5 (S.S.A. 1983).  However, "[r]elatively few unskilled light jobs are performed in a seated position."  Id.

## 1. Medical Evidence[2]

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source.  Under the regulations, a treating source's opinion is entitled to controlling weight if it iswell-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134.  Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  Schaal, 134 F.3d at 503.  If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be

_____

[2]  The ALJ considered the functional capacity evaluation of Rodriguez performed by Andrew G. Buckley, OTR/L CHT, but stated that the evaluation was "not particularly probative of [Rodriguez's] condition" because it was completed before the alleged onset date.  T. 25.  Because Rodriguez does not object to the ALJ's consideration of this particular evaluation, the Court declines to address its sufficiency.

given. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. Id. at 133-34; see 20 C.F.R. § 404.1527(e).

### a. Dr. Justine Magurno, M.D.

Dr. Magurno performed a consultative examination on Rodriguez of September 2, 2011. T. 435-40. Rodriguez reported day-to-day variability regarding his pain, but stated that, on average, his pain level was a five out of ten. Id. at 435. Walking, standing, sitting, and lying down for too long all exacerbated his pain. Id. Medication helped the pain, as did physical therapy, although only temporarily. Id. As a result of the bulldozer accident, Rodriguez reported pain levels of seven or eight out of ten in his right heel and foot, that worsened when he placed his foot on the floor. Id. He also reported pain levels of seven or eight out of ten in his right hand when he used it to hold objects. Id. He rated his knee pain as a six out of ten. Id. At the time of the examination, he reported no pain, but stated that the pain would be "sharp" if he attempted activities. Id. at 435-36.

Upon examination, Dr. Magurno noted that Rodriguez was in no acute distress. T. 437. Rodriguez could stand on his toes "with difficulty." Id. He could only stand on the left heel, not the right, and he requested to sit after standing for a few minutes, citing pain in his right foot. Id. His assistive devices included an ankle brace for the right ankle, a knee brace, and insoles for his shoes. Id. Dr. Magurno opined that he would need all assistive devices for "prolonged standing and walking." Id. Rodriguez needed no help changing for the exam, or getting on and off the exam table. Id. He rose from a chair without difficulty. Id. Dr. Magurno observed "[d]iminished breath sounds bilaterally." Id. at 438.

-10-

A musculoskeletal examination revealed full flexion/extension of the cervical spine, rotation to sixty degrees, and lateral flexion to thirty degrees. T. 438. There was no scoliosis, kyphosis, or abnormality in the thoracic spine. Id. The lumbar spine showed flexion to fifty degrees, extension to ten degrees, and lateral flexion to fifteen degrees, with full rotation. Id. Rodriguez showed full range of motion of the shoulders, elbows, forearms, and the left wrist. Id. The right wrist showed dorsiflexion to thirty degrees and palmar flexion to fifty degrees. Id. Radial and ulnar deviation were full bilaterally, although Dr. Magurno observed a "palpable click" upon ulnar deviation of the right wrist. Id. Dr. Magurno observed multiple range of motion limitations on Rodriguez's right side, but none on his left side. Id.

Dr. Magurno observed a "[s]ensory deficit in the lateral and medial right ankle as well as the right lateral heel to light touch." T. 438. Rodriguez's strength in his upper and lower extremities was a four out of five on the right side, and a five out of five on the left side. Id. An examination of Rodriguez's extremities was unremarkable, except for "atrophy of the calf musculature on the right." Id. at 439. His hand and finger dexterity was intact, except for diminished grip strength on the right. Id.

Dr. Magurno opined that Rodriguez's prognosis was "[s]table to poor" and offered the following Medical Source Statement ("MSS"):

> The claimant should avoid dust, fumes, and other known lung irritants. There are marked limitations for squatting, lifting, carrying, pushing, and pulling on the right. Moderate to marked limitations for walking and standing and moderate for bending. No limitations for fine motor activities, speech, hearing, sitting, reaching, or pushing/pulling on the left.

T. 439.

### b. Dr. Mila Bacalla, M.D.

Dr. Bacalla, a non-examining State Agency medical consultant, completed a physical RFC assessment for Rodriguez, dated April 26, 2012. T. 467-73. Dr. Bacalla opined that Rodriguez could occasionally lift and/or carry up to twenty pounds, and could frequently lift and/or carry up to ten pounds. Id. at 468. He could stand and/or walk at least two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. Id. He could push and/or pull without any limitations. Id. He could frequently climb ramps and stairs, and perform balancing. Id. at 470. Dr. Bacalla limited Rodriguez to occasionally climbing a ladder, ropes, or scaffolds; stooping; kneeling; crouching; and crawling. Id. Dr. Bacalla further opined that Rodriguez had no manipulative, visual, communicative, or environmental limitations. Id. at 470-71.

Dr. Bacalla noted Rodriguez's bulldozer accident in November 2006. T. 468. She noted that the injuries that Rodriguez sustained from that accident "were initially treated conservatively." Id. at 468-69. Dr. Bacalla noted that Rodriguez's fractures healed, although he still complained of low back, right knee, and right foot pain on November 29, 2010, and August 21, 2011. Id. at 469. She further noted the observations from Dr. Magurno's examination. Id.

The form completed by Dr. Bacalla asked if her findings were "significantly different" from the findings of the treating/examining source opinion in Rodriguez's file. T. 472. Here, Dr. Bacalla noted that the opinion she rendered was significantly different from Dr. Magurno's opinion because Dr. Magurno's "statement regarding function was not clearly specified." Id.

-12-

### c. Dr. Lawrence Weisner, D.O.

Dr. Weisner performed an orthopedic independent medical examination of Rodriguez on November 9, 2012. T. 513-19. He noted Rodriguez's records indicating the bulldozer accident, and subsequent injuries, along with records from Rodriguez's primary care physician. Id. at 514.

Upon physical examination, Dr. Weisner noted that Rodriguez had a full range of motion in his neck, and no tenderness. T. 514. Rodriguez could flex his lumbar spine to forty degrees and extend it to ten degrees. Id. He could side bend to twenty degrees. Id. Rodriguez had a full range of motion in his shoulders, elbows, wrists, and hands. Id. He had intact muscle strength in both upper extremities. Id. Rodriguez showed a full range of motion in his hips, however, hip movement caused spasms and pain in his lower back. Id. at 515. His right knee had "well-healed portals," with a range of motion up to 115 degrees, and crepitus[3] through the arc of motion. Id. There was no instability or fusion. Id. Dr. Weisner also noted that Rodriguez's right foot was healed and "mildly widened and flat in position." Id. Rodriguez's left leg had a full range of motion of the hip, knee, and ankle. Id.

Dr. Weisner opined that

> Rodriguez is moderately limited with regards to pushing, pulling, lifting and carrying or prolonged standing or walking due to low back and foot pain. His weight restrictions would be 30 to 40 pounds and not repetitively. He has no restrictions for his upper extremities. He should have freedom to sit and stand as needed due to low back condition as stated.

T. 515.

---

[3] Crepitus is "a palpable or audible grinding produced by motion." THE MERCK MANUAL 285 (Robert S. Porter, M.D. & Justin L. Kaplan, M.D. eds., 19th ed. 2011).

Additionally, Dr. Weisner completed a work capacities questionnaire. T. 516-19. Dr. Weisner opined that Rodriguez's ability to stand and walk, or sit, was limited to a maximum of two hours per day. Id. at 516. He would need to alternate between standing and sitting every fifteen minutes. Id. Dr. Weisner stated that Rodriguez would be off task, needing to lie down at unpredictable intervals, three times per week. Id. Dr. Weisner also stated that Rodriguez would be absent from work more than three times per month. Id. at 517. He would have marked limitations in his ability to sustain work pace. Id. at 518.

## 2. Analysis

Rodriguez argues that the ALJ erred in awarding significant weight to Dr. Bacalla, a non-examining source, and that the ALJ's determination that Rodriguez can perform light work is not supported by substantial evidence. Dkt. No. 10 at 13-17. The Court finds that (1) the ALJ erred in awarding significant weight to Dr. Bacalla's opinion and (2) the ALJ's RFC assessment is not supported by substantial evidence.

The ALJ afforded significant weight to Dr. Bacalla's opinion because her opinion "was based upon a review of the medical evidence of record," and because her opinion was consistent with the ALJ's own RFC assessment of Rodriguez. T. 24. In general, more weight will be given to the opinion of a source who has examined the claimant, than the opinion of a source who has not examined the claimant. 20 C.F.R § 404.1527(c)(1). A non-examining source's opinion may be given significant weight if it is supported by sufficient evidence in the record. Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 427 (S.D.N.Y. 2010). The Court finds that the ALJ erred in awarding significant weight to Dr. Bacalla's opinion, given its inconsistency with Dr. Magurno and Dr. Weisner's opinions.

Dr. Bacalla noted that she reviewed treatment notes from November 29, 2010, and August 12, 2011.[4] T. 469. On November 29, 2011, Rodriguez reported persistent right knee, right foot, and low back pain. Id. at 422. He was prescribed pain medication and told to follow-up with pain management and a podiatrist. Id. On August 12, 2011, Rodriguez exhibited chronic pain in the lumbosacral area, as well as in right ankle and foot. Id. at 505. Dr. Bacalla further cites to Dr. Magurno's examination, but explains that Dr. Magurno's examination is significantly at odds with Dr. Bacalla's assessment. Id. at 469, 472. Notably, while Dr. Bacalla opined that Rodriguez could stand and/or walk *at least* two hours in an eight-hour work day, Dr. Magurno stated that Rodriguez would have moderate to marked limitations in his ability to walk and stand. Id. at 439, 468. Additionally, Dr. Weisner opined that Rodriguez's maximum ability to stand and walk during an eight-hour work day was limited to two hours. Id. at 516. Dr. Magurno observed that Rodriguez had to sit after standing for only a few minutes, due to pain in his foot. Id. at 437. Additionally, the ALJ failed to consider the factors enumerated in the regulations in assessing Dr. Bacalla's opinion, noting cursorily that "her opinion [was] consistent with the [RFC] that I have formulated for the claimant." T. 24; see 20 C.F.R. § 404.1527(d)(2).

Because the ALJ erred in awarding significant weight to Dr. Bacalla's opinion, the ALJ's RFC assessment is necessarily flawed. The only opinion supporting the limitations set forth by the ALJ was Dr. Bacalla's. Indeed, the Commissioner concedes that Dr. Magurno's findings are "ambiguous" and therefore the ALJ was justified in using Dr. Bacalla's opinion to support the RFC finding. Dkt. No. 11 at 7. However, the

---

[4] Dr. Bacalla stated that she reviewed a treatment note from August 21, 2011, however, the correct date of the corresponding treatment note is August 12, 2011. See T. 469, 505.

inconsistencies between Dr. Magurno's findings, and Dr. Bacalla's assessment, coupled with Dr. Weisner's inconsistent assessment,[5] is precisely why this matter must be remanded. While the ALJ is not required "'to reconcile explicitly every conflicting shred of medical testimony, he cannot simply selectively choose evidence in the record that supports his conclusions.'" Hill v. Astrue, No. 1:11-CV-0505(MAT), 2013 WL 5472036, at *12 (W.D.N.Y. Sept. 30, 2013) (quoting Gecevic v. Sec'y of Health and Human Servs., 882 F. Supp. 278, 286 (E.D.N.Y. 1995) (internal quotation marks and citation omitted). Dr. Bacalla's opinion alone is insufficient to support a finding that Rodriguez is capable of light work, given that two physicians who actually examined Rodriguez suggest that his abilities would be more restricted. See Hidalgo v. Bowen, 822 F.2d 294, 297 (2d Cir. 1987) (finding that the opinion of a non-examining physician is not substantial evidence sufficient to override a treating physician's diagnosis).

Under Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000), superseded by statute on other grounds, as recognized in Douglass v. Astrue, 496 F. App'x 154 (2d Cir. 2012), the burden shifts to the Commissioner at step five to prove that the claimant is capable of working, and where the Commissioner's determination is based on a vague medical opinion, the Commissioner has failed to meet that burden. Here, because the Court finds that Dr. Bacalla's opinion is significantly at odds with Dr. Magurno's and Dr. Weisner's

---

[5] The ALJ awarded only limited weight to the opinion of Dr. Weisner, in large part because the ALJ found that the limitations that Dr. Weisner stated on the work capacities questionnaire conflicted with the restrictions Dr. Weisner stated in the body of his written evaluation. T. 25. The Court finds that, given the perceived inconsistencies between Dr. Weisner's assessments, the ALJ should have sought out clarifying information from Dr. Weisner, especially given the conflicting opinions from Drs. Magurno and Bacalla. Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998) (remanding where the ALJ failed to affirmatively seek clarification from a doctor where the ALJ noted perceived inconsistencies in two reports from the same doctor).

opinions, the Commissioner has not met its burden at step five, since Dr. Magurno's findings, to which the ALJ awards significant weight, do not support the conclusion that Rodriguez can perform light work. Unskilled light work involves "a good deal of standing" and Dr. Magurno's limitations indicate that Rodriguez suffers moderate to marked limitations in his ability to stand. See 20 C.F.R. § 404.1567(b); T. 439. Additionally, because Rodriguez is limited to unskilled work, and there are very few unskilled light exertion jobs that exist in the national economy, the Commissioner has not met its burden to show that Rodriguez is capable of light work.

Accordingly, this matter is remanded, and the ALJ is directed to reevaluate the weight awarded to the opinions of Drs. Bacalla and Weisner, and if necessary, recontact the physicians to clarify any perceived inconsistencies between the opinions of Drs. Bacalla, Weisner, and Magurno.

### F. Mental Limitations

Rodriguez argues that the ALJ erred in determining limitations caused by Rodriguez's mental health impairments by (1) awarding "great weight" to the opinion of Dr. Long; (2) awarding "great weight" to Dr. Hochberg; (3) awarding "no weight" to Dr. Hare; (4) awarding little weight to Jones-Giles; and (5) failing to consider Dr. Naik's opinion. Dkt No. 10 at 17-23. The Court finds that, because the ALJ failed to consider Dr. Naik's opinion, this matter must be remanded.

The ALJ awarded "great weight" to the opinion of Dr. Long, who performed a one-time psychiatric evaluation of Rodriguez on September 2, 2011, and Dr. Hochberg, a non-examining State Agency medical consultant, who completed a Psychiatric Review

Technique and a Mental RFC Assessment of Rodriguez on September 22, 2011. See T. 441-459, 556-59.

At the time of Dr. Long's evaluation, Rodriguez had no psychiatric hospitalizations or outpatient treatment history. T. 441. Rodriguez reported loss of appetite, trouble staying asleep, and hearing voices, or a phone ringing. Id. Dr. Long performed a mental status examination and reported largely normal findings, although Rodriguez reported some paranoia, in that he feels that people are watching him. Id. at 442. Rodriguez's appearance, affect, and mood were all normal, but Dr. Long noted that Rodriguez's cognitive functioning could possible be in the below-average range. Id. at 442-43. Dr. Long opined that Rodriguez's insight and judgment were poor. Id. at 443. Dr. Long diagnosed Rodriguez with a substance abuse problem due to his use of cannabis, but noted that Rodriguez's prognosis was "good given substance relapse prevention." Id. at 444. Dr. Long opined that Rodriguez could follow and understand simple directions and instructions; perform simple and complex tasks independently; maintain attention and concentration; maintain a regular schedule; learn new tasks; and make appropriate decisions. Id. at 443. Dr. Long stated that Rodriguez could "relate adequately with others" and was "capable of adequate stress management." Id. at 444. He noted that Rodriguez's substance abuse issue did "not appear to be significant enough to interfere with his ability to function on a regular basis." Id.

When Dr. Hochberg performed a Mental RFC Assessment of Rodriguez on September 22, 2011, Rodriguez had no history of outpatient treatment, and the only evaluation of Rodriguez's mental health in his medical record was Dr. Long's consultative examination. T. 558. Dr. Hochberg cited Dr. Long's findings in concluding that Rodriguez

-18-

"retains the functional capacity for entry level work with simple tasks and limited contact with the public." Id.

Rodriguez's first outpatient treatment appointment with Jones-Giles, a clinical social worker with the Broome County Mental Health Clinic, was on October 6, 2011. T. 509-11. At that appointment, Rodrigeuz reported that he wanted to return to work, but was having difficulty. Id. at 509. He stated that he had difficulty focusing, and sleeping. Id. He cried often, and stated that he avoided people. Id. He also reported paranoia and auditory hallucinations. Id. Rodriguez also reported that "he wanted to hurt someone most of the time" but did not act on those thoughts after he considered the consequences such violence would produce. Id. A mental status exam was normal except that Rodriguez exhibited an anxious mood, and a tangential and circumstantial thought process. Id. at 510. Jones-Giles noted that Rodriguez was aware of his symptoms and motivated for treatment. Id. She diagnosed Rodriguez as suffering from schizoaffective disorder, bipolar type, and noted that his GAF score was 65. Id. at 511.

Rodriguez was evaluated by Dr. Naik at the Broome County Mental Health Clinic on December 14, 2011. T. 506-08. Rodriguez appeared generally angry, and reported paranoia, feeling like people were talking about him when he walked down the street, and hearing voices. Id. at 506. He stated that he had no ambition, slept poorly, and thought that he talked too much. Id. Dr. Naik noted that Rodriguez presented as casually dressed with adequate hygiene. Id. at 507. Rodriguez behaved cooperatively. Id. Dr. Naik did not observe any bizarre behavior or involuntary movement, but noted that Rodriguez's speech was "slightly overproductive," and he easily veered off-topic. Id. Rodriguez's thoughts were "disjointed," and his thought process was difficult to follow. Id. Although Rodriguez

-19-

expressed paranoid ideas and auditory hallucinations, Dr. Naik did not observe any systematized delusions. Id. Rodriguez's mood was irritable and his affect was anxious. Id. Rodriguez again reported a desire to hurt people but denied suicidal ideations. Id. He was alert and oriented, with memory intact, but his concentration was mildly impaired. Id. Dr. Naik noted that Rodriguez's insight and judgment was limited. Id.

Dr. Naik diagnosed Rodriguez with a schizoaffective disorder, bipolar type, and ruled out a substance-induced mood disorder. T. 507. He noted that Rodriguez's GAF score was 60. Id. He advised that Rodriguez continue taking Cymbalta and Ambien, and prescribed Zyprexa. Id. at 508.

Rodriguez was seen by Jones-Giles for follow-up appointments on December 20, 2011, and January 13, 2012, where he made some progress toward his treatment goals. T. 600-01. Rodriguez was seen by Dr. Naik on January 19, 2012, and reported feeling less angry and calmer. Id. at 598. However, he stated that he still felt that people were staring at him, and that he continued to hear voices. Id. Dr. Naik noted Rodriguez's hallucinations, and noted Rodriguez's mild depression and flat affect. Id. No other significant observations were reported. Id. Dr. Naik increased Rodriguez's dose of Zyprexa. Id. at 599.

On January 27, 2012, Rodriguez reported to Jones-Giles that he was pleased that the Department of Social Services had covered the rent and security deposit for an apartment for him to live in. T. 597. Rodriguez discussed his bulldozer accident, and the chronic pain from the accident, with Jones-Giles on February 10, 2012. Id. at 594. He also stated that he wanted to return to the workforce. Id.

On February 16, 2012, Rodriguez reported to Dr. Naik that he felt better, with improved sleep, but still felt fear and had suspicious ideas when he walked on the streets.

T. 595.  A mental status exam showed no significant changes, aside from Rodriguez's paranoia.  Id.  On April 12, 2012, Rodriguez reported to Dr. Naik that he was able to control his anger better while taking Zyprexa, but he still heard voices.  Id. at 592.  Nevertheless, he exhibited a euthymic mood and bright affect.  Id.

Rodriguez continued to report auditory hallucinations to Jones-Giles on May 8, 2012. T. 591.  Rodriguez reported that, in regards to substance abuse, he had remained abstinent.  Id.  He reported no change in his psychiatric condition to Dr. Naik on May 22, 2012.  Id. at 589.  He also reported that he continued to hear voices, although his sleep improved on Zyprexa.  Id.  Dr. Naik noted that Rodriguez exhibited a constricted affect and stable mood, and that his auditory hallucinations were "bothersome."  Id.  Dr. Naik discontinued Rodriguez on Zyprexa in an attempt to stop his hallucinations and weight gain. Id. at 590.  He prescribed Risperidone.  Id.

On May 30, 2012, Rodriguez was "agitated" during his appointment with Jones-Giles and reported seeing shadows in his home.  T. 588.  Rodriguez was compliant with his medication regimen, but still had difficulty sleeping.  Id.  On June 18, 2012, Rodriguez reported to Jones-Giles that he had assaulted someone and was unsure whether he could change his aggressive behavior.  Id. at 587.

On July 9, 2012, Rodriguez presented to Jones-Giles for a crisis intervention.  T. 586. He appeared tearful, hopeless, and exhibited a flat affect.  Id.  He also appeared unmotivated, and expressed suicidal ideations.  Id.  Jones-Giles recommended that he go to a Comprehensive Psychiatric Emergency Program ("CPEP") and Rodriguez agreed.  Id.

Rodriguez was hospitalized on July 9, 2012, and discharged on July 18, 2012.  T. 552-54.  Rodriguez's discharge paperwork indicated that he had a GAF score of 40.  Id. at

552. During his admission, Rodriguez reported auditory hallucinations, and external stressors due to his financial situation. Id. at 553. His medication was adjusted, and he reported improvement in his ability to focus. Id. Upon discharge, Rodriguez exhibited no concerning symptoms except some anxiousness. Id. He was advised to continue treatment with Dr. Naik. Id.

On July 23, 2012, Rodriguez was seen by Jones-Giles, who noted that Rodriguez had a flat affect, although he appeared less agitated. T. 585. On July 26, 2012, Rodriguez saw Dr. Naik, and reported that his condition had not changed. Id. at 583. Dr. Naik noted that Rodriguez exhibited a low mood and a flat affect. Id. Dr. Naik stated Rodriguez on three new medications: Citalopram, Trazodone, and Vistani. Id. at 584.

Rodriguez appeared depressed and tearful at an appointment with Jones-Giles on August 14, 2012. T. 582. His affect was flat. Id. He reported that he was beginning to have auditory hallucinations again. Id. His affect improved slightly on August 28, 2012. Id. at 581. He was not tearful, and appeared to be in better control of his emotions. Id.

On August 29, 2012, Rodriguez complained of sleep problems, stiffness, and edginess to Dr. Naik. T. 579. Dr. Naik observed that Rodriguez had a low mood and a flat affect. Id. Dr. Naik continued Rodriguez on Risperidone, as it appeared to be helping with decreasing Rodriguez's auditory hallucinations, although it caused akathisia.[6] Id. Rodriguez agreed to try Cogentin[7] as well. Id.

On September 18, 2012, Rodriguez had a flat affect and gave limited responses to

---

[6] Akathisia is "an unpleasant sensation of motor restlessness." THE MERCK MANUAL at 1492.

[7] Cogentin is used for "[t]reating Parkinson disease in combination with other medicines. It is also used to control tremors and stiffness of the muscles due to certain antipsychotic medicines." DRUGS.COM, http://www.drugs.com/cdi/cogentin.html (last visited Mar. 29, 2016).

questions during an appointment with Jones-Giles. T. 578. His affect was improved on October 16, 2012, but he continued to report auditory hallucinations and feeling paranoid. Id. at 577. Jones-Giles encouraged Rodriguez to discuss medication adjustment with Dr. Naik. Id.

On October 24, 2012, Rodriguez saw Dr. Naik and reported increased sleep problems, and that his auditory hallucinations had returned after being absent for the three months prior. T. 575. Rodriguez again had a low mood and a flat affect. Id. Dr. Naik switched Rodriguez's medication from Risperidone to Seroquel. Id. On November 20, 2012, Rodriguez reported improved sleep on Seroquel. Id. at 573. He told Dr. Naik that his auditory hallucinations had decreased, but not completely. Id. He also reported feeling "fearful and suspicious" when he leaves his apartment. Id. He denied drug or alcohol use. Id. Also on November 20, 2012, Rodriguez saw Jones-Giles, and reported that he felt calmer, and that his symptoms had improved overall. Id. at 572.

On January 17, 2013, Jones-Giles completed a mental questionnaire of Rodriguez's abilities. T. 603-05. She opined that Rodriguez would have medium limitations in his ability to concentrate for extended periods of time; none, or mild limitations in his ability to maintain a schedule, and be punctual; more than slight limitations in his ability to sustain an ordinary routine without special supervision; and marked limitations in his ability to complete a normal workday and maintain a consistent pace. Id. at 603. He would have medium limitations in his ability to interact appropriately with the general public, and accept and respond appropriately to criticism from supervisors. Id. at 604. He would have more than a slight limitation in his ability to interact with co-workers or peers, and respond appropriately to stressors in a work setting. Id. He would have none, or only mild limitations in his ability

-23-

to respond appropriately to changes in a work setting.  Id.  Jones-Giles opined that Rodriguez's mental condition would cause him to be absent from work two to three times per month.  Id.  She attributed these limitations to Rodriguez's schizoaffective disorder and noted that Rodriguez "often becomes hypervigilant, is easily agitated, often depressed, and experiences anxiety."  Id.  However, she stated that his symptoms are managed with medication.  Id.

Although the questionnaire completed by Jones-Giles has a signature line for Dr. Naik, Dr. Naik did not sign the questionnaire.  T. 605.  However, on June 6, 2013, both Jones-Giles and Dr. Naik signed a statement that stated that Rodriguez's condition had stayed the same, with the same limitations, since the January 17, 2013 evaluation.  Id. at 622.

Dr. Hare provided the Broome County Department of Social Services with an opinion regarding Rodriguez's mental health limitations and the limitations' impact on his ability to work.  T. 612.  Dr. Hare provided the opinion on May 31, 2013.  Id.

At Dr. Hare's examination of Rodriguez, Rodriguez was cooperative and coherent, although he appeared agitated and his speech was rapid.  T. 613.  His affect was labile, and his mood was anxious, depressed, and irritable.  Id.  Rodriguez did not exhibit any delusional thinking or suicidal thoughts.  Id.  His insight and judgment were fair.  Id.  Testing showed that Rodriguez had an adequate fund of general information, but his attention and concentration were impaired.  Id. at 614.  He exhibited average intellectual functioning.  Id.  He denied recreational drug use, stating that he had stopped using marijuana in 2012.  Id.

Dr. Hare noted that Rodriguez showed "severe levels" of reported depression and anxiety symptoms.  T. 615.  MMPI-2 validity scales produced a profile for Rodriguez similar

to individuals who "have significant emotional and psychological problems." Id. "These patients generally lack the ability and personal resources to deal with day to day life problems and stressors." Id. Dr. Hare also noted Rodriguez's paranoid thinking, and chronic pain as significantly impacting his functioning. Id. at 615-16. Although Dr. Hare noted that Rodriguez obtained a high score on a SIMS test, "an actuarial based and empirically developed scale to screen for malingering and symptom over-reporting," Dr. Hare stated that a high score was expected "given [Rodriguez's] overall level of psychological problems and disorganization." Id. at 616.

As a result of Dr. Hare's examination, Dr. Hare determined that Rodriguez "is not able to do sustained work-related physical or mental activities in a work like setting on a regular and continuing basis." T. 616. He rated Rodriguez's GAF score at 45. Id.

Dr. Hare noted that Rodriguez had "no useful ability to function" in most areas of mental abilities and aptitudes needed to do unskilled work. T. 618. Dr. Hare further opined that Rodriguez's impairments could be expected to last at least twelve months. Id. at 620.

The Court finds that the ALJ erred in not considering Dr. Naik's opinion as a treating source opinion under the regulations. "The duty of an ALJ to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations." Dickson v. Astrue, 2008 WL 4287389, at *13 (N.D.N.Y.2008) (citing Devora v. Barnhart, 205 F.Supp.2d 164, 172 (S.D.N.Y.2002)). When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign. 20 C.F.R. § 404.1527(d)(2); section II.E.i supra. The Regulations also specify that the Commissioner "will always give good reasons in [her] notice of determination or decision for

the weight [she] give[s] [claimant's] treating source's opinion." <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir.2004) (citing 20 C.F.R. § 404.1527(d)(2)); <u>see</u> <u>also</u> <u>Schaal</u>, 134 F.3d at 503-04.

Here, the ALJ completely neglected to consider that the evaluation completed by Jones-Giles, although unsigned by Dr. Naik, was a treating source opinion. Both Dr. Naik and Jones-Giles examined Rodriguez many times between November 2011 and November 2012. As such, Dr. Naik is considered a "treating physician" under the regulations. <u>See</u> <u>Coty</u>, 793 F.Supp. at 85-86. Given Dr. Naik's treatment history with Rodriguez, it is unclear why the ALJ did not even consider Dr. Naik's treatment notes when evaluating Rodriguez's condition. While it is true that Dr. Naik's signature is not present on the evaluation completed by Jones-Giles, as argued by the Commissioner, Dr. Naik did sign a later statement confirming that Rodriguez's condition remained unchanged from January 17, 2013 through June 6, 2013, which indicates that Dr. Naik agreed with the limitations set forth by Jones-Giles not only for that time period, but also for the time period preceding January 17, 2013. Further, to the extent that it was unclear whether Dr. Naik affirmed the limitations set forth in the questionnaire, it was the ALJ's duty to clarify the record. <u>Schaal</u>, 134 F.3d at 505 n.9 (finding that where the record was unclear about whether the plaintiff was examined by the treating physician or a nurse practitioner, it was the ALJ's duty to clarify the record).

It is well-established that the ALJ must provide adequate reasons for not awarding the opinion of a treating physician controlling weight. <u>Burgess v. Astrue</u>, 537 F.3d 117, 129 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2)). Here, not only did the ALJ fail to consider Dr. Naik's opinion, he awarded "great weight" to two physicians who rendered their

opinions nearly one and a half years prior to the opinion of the treating physician, and before Rodriguez began significant mental health treatment and was briefly hospitalized in a psychiatric facility. Given the amount of time between the dates that Dr. Long and Dr. Hochberg rendered their opinions, and the date that Dr. Naik rendered an opinion, Dr. Long and Dr. Hochberg's opinions are not considered substantial evidence sufficient to override Dr. Naik's opinion. Mejia v. Barnhart, 261 F. Supp. 2d 142, 147 (E.D.N.Y. 2003) (finding that a consulting physician's report that was issued four months prior to a treating physician's first examination of the plaintiff did not constitute substantial evidence sufficient to override the treating physician's opinion).

Because the Court finds that the ALJ erred in failing to consider Dr. Naik's opinion, this matter must be remanded. Given the ALJ's failure to apply the treating physician rule, the weight that the ALJ afforded to Drs. Long, Hochberg, and Hare may change on remand, because the ALJ must assess whether these doctors opinions are consistent with Dr. Naik's opinion, which encompasses a significant time period. See 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion.") The ALJ is specifically directed to reassess these doctors' opinions after considering Dr. Naik's opinion under the treating physician rule.

### G. Rodriguez's Credibility

Rodriguez argues that the ALJ's credibility determinations are not supported by substantial evidence. Dkt. No. 10 at 23-25. Specifically, Rodriguez argues that (1) there is no medical basis for the ALJ to conclude that Rodriguez engaged in only "conservative" treatment; (2) the ALJ improperly used Rodriguez's referral to VESID in assessing his

credibility; and (3) the ALJ improperly used the fact that Rodriguez did not "aggressively" pursue workers' compensation benefits in assessing his credibility.  Id.

As an initial matter, the Court notes that because the ALJ's credibility analysis is based on a flawed evaluation of the medical opinions in the record and must be reassessed on remand.  However, the Court notes that "a conservative treatment program alone" cannot "weigh substantially against [Rodriguez's] credibility."  Valerio v. Comm'r of Soc. Sec., No. 08-CV-4253 (CPS), 2009 WL 2424211, at *15 (E.D.N.Y. Aug. 6, 2009).  Here, it was inappropriate for the ALJ to determine that Rodriguez's treatment regimen was "conservative" absent any medical evidence questioning the appropriateness of the treatment that Rodriguez received.  See Shaw, 537 F.3d at 129 (noting that "the ALJ is [not] permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion.") (citing Balsamo, 142 F.3d at 81).

As to the ALJ's consideration of Dr. Angela L. Crawford, Ph.D.'s notation that Rodriguez had initiated contact with VESID, (T. 525), such a consideration was not erroneous.  An ALJ may consider a claimant's pursuit of vocational rehabilitation in determining their ability to work.  See Poupore, 566 F.3d 303, 305.  Likewise, the ALJ may consider the timing and terms of settlement of a claimant's workers' compensation claim in assessing credibility.  Lasiege v. Colvin, No. 7:12-CV-01398 (NAM/TWD), 2014 WL 1269380, at *6 (N.D.N.Y. Mar. 25, 2014) (rejecting the plaintiff's argument that the terms of her workers' compensation settlement should not have been considered in assessing the plaintiff's credibility).

Given the ALJ's errors in weighing the medical opinions of record, the credibility assessment is necessarily flawed.  The ALJ's proper evaluation of the medical opinions will

impact the credibility assessment on remand. Accordingly, the ALJ is directed to reassess Rodriguez's credibility on remand. See Mortise v. Astrue, 713 F. Supp. 2d 111, 124 (N.D.N.Y. 2010).


### H.  Limitations Due to Asthma/COPD

Rodriguez argues that the ALJ erred in failing to consider any limitations caused by his asthma. Dkt. No. 10 at 25-26. The Court finds that the ALJ did not err in finding that the record did not support additional limitations in Rodriguez's RFC to account for his asthma. Although Dr. Magurno noted that Rodriguez exhibited "diminished breath sounds," (T. 438), Rodriguez's primary care physician observed that Rodriguez's chest was clear, and he had no issues on multiple occasions. Id. at 502, 505, 607. There is one treatment note in Rodriguez's medical record that indicates he was having trouble with his asthma. Id. at 421. However, his primary care physician adjusted his medication and subsequent medical records show that Rodriguez did not report any further issues, nor did a doctor observe any deterioration of his condition. Id. Additionally, Rodriguez did not mention his asthma at the hearing before the ALJ, and testified that he could go outside and walk. Id. at 66. Although he mentioned that his pain affects his ability to walk, he reported no problems in his ability to breathe. Id. He also continued to smoke cigarettes. Id. at 71.

Accordingly, the Court finds that the ALJ did not err in his assessment of the limitations caused by Rodriguez's asthma. See Houle-Call v. Comm'r of Soc. Sec., No. 1:12-cv-1685 (GLS), 2013 WL 6183856, at *2 (N.D.N.Y. Nov. 26, 2013) (finding that the ALJ did not err in assessing no limitations due to the plaintiff's asthma where "the record [was] devoid of any evidence indicating that [the plaintiff's] asthma diminished her ability to

work.").

### III. Conclusion

Having reviewed the administrative transcript and the ALJ's findings, the Court concludes that the ALJ's determination is not supported by substantial evidence. Remand for further administrative action consistent with this Memorandum-Decision and Order is needed. Accordingly, it is hereby

**ORDERED** that plaintiff's motion for judgment on the pleadings is **GRANTED** (Dkt. No. 10). The matter is remanded to the Commissioner for additional proceedings consistent with the above, pursuant to sentence four of 42 U.S.C. 405(g); and it is further

**ORDERED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 11) is **DENIED**; and it is further

**ORDERED** that the Clerk of the Court serve copies of the Memorandum Decision and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Dated:     March 31, 2016
           Albany, New York

Christian F. Hummel
U.S. Magistrate Judge